IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DORIS R.S. CURL, M.Ed.         *

       Plaintiff             *

     v.                  *     Civil Action No.:  GJH-15-3133

POTOMAC CONF. CORP. OF    *
SEVENTH-DAY ADVENTISTS, et al.
                          *

       Defendants         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff Doris R.S. Curl, M.Ed., by and through her undersigned counsel, hereby opposes Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, and states as follows:

## I.  INTRODUCTION

### A.  Procedural History

On May 15, 2015, having satisfied all of the administrative prerequisites for pursuing her discrimination and retaliation claims, Plaintiff filed her 12-count Complaint against Defendants Potomac Conference Corporation of Seventh-day Adventists and Beltsville Adventist School in the Circuit Court for Prince George's County, Maryland. *See generally* Pl.'s Complaint.  In her suit, Plaintiff asserted contractual claims (Counts I and II), a tort claim for wrongful discharge in violation of public policy under Maryland common law (Count III), disability discrimination/retaliation claims under federal, state,

and local law (Counts IV, V, VI, VII, and VIII), a claim under the Fair Labor Standard Act (Count IX), and claims for age discrimination under federal, state, and local law (Counts X, XI, and XII). *See id.* Plaintiff did not seek reinstatement with Defendants in any of requested relief in her Complaint; she sought only financial relief. *Id.*

Thereafter, Defendants were served with process and Plaintiff's discovery requests on September 17, 2015. *See* Pl.'s Oct. 30, 2015 Motion to Remand at 1. On October 14, 2015, one day before removing the case from the Circuit Court for Prince George's County, Defendants filed their Motion to Dismiss or in the Alternative for Summary Judgment. In their Motion, Defendants assert that the so-called "ministerial exception" bars all of Plaintiff's claims against them. *See generally* Defs.' Motion and Memo. Plaintiff now timely files her opposition to Defendants' Motion with this Honorable Court.[1]

## B. Discovery is Needed

Needless to say, no discovery has yet been conducted by the parties in this case. As such, the record in this case is not yet fully developed and should give this Court pause in considering these critical issues at such an early stage in the proceedings. *See, e.g., Hough v. Roman Catholic Diocese of Erie*, Civ. A. No.: 12-253, 2014 U.S. Dist. LEXIS 27159, at *14 (W.D. Pa. March 4, 2014) (in denying dispositive motion filed in advance of discovery in which defendants asserted that plaintiff's age discrimination claim was barred by ministerial exception, court ruled that "[d]iscovery is needed to

---

[1] Plaintiff is obligated to file her opposition with this Court despite the fact that she maintains that Defendants' removal of the case was improper. *See* Pl.'s Oct. 30, 2015 Motion to Remand at 2 n.2.

provide a fuller picture for this multi-factored analysis," and that "the application of the ministerial exception may be revisited in the future upon a more fully developed factual record."). Moreover, by virtue of the absence of discovery to date, the assertions by Defendants' witness, while under oath, have not been subject to any cross-examination. While Plaintiff recognizes that the Court is permitted to grant dispositive relief based upon affidavits and other documentary evidence, the value of cross-examination should not be discounted.

In the case of *Green v. McElroy*, 360 U.S. 474 (1959), the U.S. Supreme Court, quoting Professor Wigmore's treatise on evidence, stated as follows:

> For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

*Id.* at 496-97 (quoting 5 Wigmore on Evidence § 1367 (3d ed. 1940)). *See Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (finding that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to . . . cross-examine adverse witnesses."). *See also Deinhardt v. State*, 29 Md. App. 391, 395-96 (1975) ("[A] witness may be discredited by a '. . . cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.' Bringing to the surface, for view and scrutiny[,] the witness's motivation for testifying is both a proper and important

function of cross-examination and, as such, is a constitutionally protected right." (citation omitted) (ellipsis in original)).

Accordingly, a ruling on this matter at this juncture would be premature, and should at least await the conduct of discovery by the parties.

### C. Ministerial Exception is Affirmative Defense, Which Impacts Court's Consideration of Defendants' Motion

In the U.S. Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S. Ct. 694 (2012), the Court declared that the ministerial exception is an <u>affirmative</u> <u>defense</u>. *See id*. at 709 n.4. As such, <u>Defendants</u> have the burden in this proceeding to prove that the exception is applicable, which should weigh heavily <u>against</u> a grant of dismissal or summary judgment in their favor by this Court. According to the Fourth Circuit:

> "As is well established, in a summary judgment proceeding the party against whom the burden of proof falls at trial faces a challenge more difficult than otherwise. … Here the [defendants] must do more than put the issue into genuine doubt; indeed, <u>they must remove genuine doubt from the issue altogether</u>."

*Hoover Color Corp. v. Bayer Corp*., 199 F.3d 160, 164 (4th Cir. 1999) (ellipsis in original) (emphasis added) (quoting *Alan's of Atlanta, Inc. v. Minolta Corp*., 903 F.2d 1414, 1425-26 (11th Cir. 1990)). *See also id*. (referring to burden imposed upon defendants in this situation as a "heavy" one). As such, Defendants herein have "the burden of showing that there is no genuine issue of fact, regardless of the quality or quantity of evidence submitted by Plaintiff, and where all inferences are drawn in favor of Plaintiff." *Sonfast Corp. v. York Int'l Corp.*, 875 F. Supp. 1088, 1094 (M.D. Pa.

1994).  This dynamic should cause the Court to lean heavily in favor of Plaintiff in construing all facts and making its legal findings.

## II.  STATEMENT OF FACTS

### A.  Sequence of Pertinent Events

Plaintiff worked as a music teacher for more than 25 years at Defendant Beltsville Adventist School, which is owned and operated by Defendant Potomac Conference Corp.  *See* Pl.'s Complaint at 3.  *See also* Dec. 18, 2013 Charge of Discrimination, attached hereto as "Exhibit 1."

On or about February 6, 2013, while working at the School, Plaintiff fell and sustained a serious physical and neurological injury constituting a disability.  *See* Charge of Discrimination.  The disability adversely impacted and substantially limited the operation of Plaintiff's brain, neurological system, and musculoskeletal system.  *See* Pl.'s Complaint at 3.  The disability also substantially limited other major life activities of Plaintiff, including but not limited to caring for herself, performing manual tasks, seeing, concentrating, and thinking.  *See id*. at 3-4.

Said disability resulted in the filing of a claim for workers' compensation benefits by Plaintiff in or about March of 2013.  *See* Charge of Discrimination.

Following her fall, Plaintiff received a course of medical treatment from neurologists and other physicians.  *See id*.  A series of notes were issued by these physicians requiring Plaintiff's absence from work on account of her disability for set periods of time.  *See id*.

In late April of 2013, while still out on leave pursuant to her physicians' orders, Plaintiff was presented with and signed her annual contract with Defendants for the 2013-14 school year. *See id.* The contract was then signed by a representative of Defendants, Keith L. Hallam, in May of 2013. *See id.* Mr. Hallam served, and continues to serve, as the Vice-President for Education with Defendant Potomac Conference Corp. *See* Pl.'s Complaint at 4. Pursuant to the contract, Plaintiff's "report to work date" was August 12, 2013. *See* Charge of Discrimination. *See also* May 2013 Contract, attached to Defendants' Motion at Exhibit C.

On or about July 5, 2013, Plaintiff received a letter from Defendants' Human Resources Director at the time, Johanna Prestol-Dominguez, dated June 28, 2013. *See* Charge of Discrimination. In the letter, Ms. Prestol-Dominguez expressly referenced Plaintiff's signed contract and the return to work date of August 12, 2013, and stated that, if Plaintiff was unable to return to work by that date, her position would not be held open and other staffing arrangements would need to be made. *See id.* The letter stated, in pertinent part, as follows:

> You have signed a contract for the 2013/2014 school year and since the (sic) you do not need to be in the classroom until later this year, we (sic) will begin to be paid for your contract wages in July 2013 as we await final word closer to the beginning of the report to work date of August 12, 2013. We hope that your physician will clear you for return to work and know that is your wish as well. However, if you are unable to return to work on that date[,] we have chosen to provide you with a full month's wages through August 30, 2013 above and beyond policy. At that time[,] it will not be possible for us to hold your position open for you any longer and other staffing arrangements will need to be made.
>
> If you are unable to return to work after (sic) by September (sic) this date[,] we would recommend that you apply for the Long Term Disability (LTD)

income[,] which will provide you with 66 2/3% of your income – which is approximately what is left after taxes – until your attending physician determines that you are able to return to work.

June 28, 2013 Letter from Prestol-Dominquez at 1-2, attached hereto as "Exhibit 2." The letter further referenced Plaintiff's "Workmen's Compensation" claim as well as her coverage under the Family and Medical Leave Act (hereinafter "FMLA"). *Id.* at 2. In relation to the FMLA, the letter stated: "An active FMLA status protects your job while you are away from work recuperating from a surgical procedure/injury/illness. By law you are allowed 90 days/12 weeks under the protected status in a rolling 12-month period." *Id.* at 1.

On August 7, 2013, Plaintiff was treated by her physician, Kevin E. Crutchfield, M.D., who is the Director of the Comprehensive Sports Concussion Program at the Berman Brain and Spine Institute as well as the Director of the Noninvasive Vascular Laboratories in the Department of Neurology at Sinai Hospital in Baltimore. *See* Charge of Discrimination. In a note dated August 8, 2013, Dr. Crutchfield authorized Plaintiff to return to work "with accommodations." *See id.* Specifically, Plaintiff needed to be allowed a 15-20 minute rest break in a low-lit, quiet environment after every 2 to 3 hours of active work at the School.[2] *See id. See also* Aug. 8, 2013 Note from Crutchfield, attached to Defendants' Motion as Exhibit H.

---

[2] Dr. Crutchfield's note also mentioned the potential need for Plaintiff to be relieved of her duties for part of a given day, but that was only in the eventuality that Plaintiff's symptoms became exacerbated in the work environment and did not subside with the rest break(s). *See* Aug. 8, 2013 Note from Crutchfield, attached to Defendants' Motion as Exhibit H.

On August 9, 2013, in an email entitled "returning to work," Plaintiff notified the School's principal, Wendy Pega, and Mr. Hallam that her doctor had allowed her "to return to work with minor accommodations which will not affect [her] performance as a teacher." Aug. 9, 2013 Email from Plaintiff, attached hereto as "Exhibit 3." Plaintiff further indicated that she would bring the doctor's note with her when she reported for work on August 12th. *See id.* She signed off by saying "P.S.: I'm excited to go back to work!" *Id.*

On August 11, 2013, in a responsive email to Plaintiff, Ms. Prestol-Dominguez requested that Plaintiff not return to work until the situation with her accommodation request could be addressed.[3] *See* Aug. 11, 2013 Email Exchange, attached hereto as "Exhibit 4." Ms. Prestol-Dominguez further alleged that Plaintiff's contract had been "rescinded" the previous week at the direction of Defendant Potomac Conference Corp., which Plaintiff was not aware of.[4] *See id. See also* Charge of Discrimination.

On August 14, 2013 at 9:07 a.m., without ever engaging in any sort of interactive process, Ms. Prestol-Dominguez bluntly told Plaintiff in an email that the School had reviewed Dr. Crutchfield's note and "will not be able to accommodate the restrictions he has placed upon your work return." Aug. 14, 2013 Email from Prestol-Dominquez, attached hereto as "Exhibit 5." Ms. Prestol-Dominguez went on to say that

---

[3] Plaintiff <u>did</u> report to the School on August 12, 2013, and endeavored to discuss the situation with Ms. Pega and Ms. Prestol-Dominguez, but they promptly sent her home. *See* Pl.'s Complaint at 5 n.4.

[4] Plaintiff did not receive a copy of this letter, which is Exhibit G to Defendants' Motion, until she reported for work on August 12, 2013, at which time she was given a copy. *See* Aug. 14, 2013 Email from Prestol-Dominquez, attached hereto as "Exhibit 5."

"[a]ccommodation of the restrictions would not permit you to perform the basic core functions of the position as set forth in your employment agreement."[5] *Id.*

This was not true. Based on Plaintiff's teaching schedule, there would have been sufficient gaps in time that would have readily allowed her to take the medically necessary rest breaks. *See* Charge of Discrimination. Nevertheless, Plaintiff found herself discriminated and retaliated against, unaccommodated, and unemployed.[6] *See id. See also* Pl.'s Complaint at 6.

## B. Plaintiff Curl's Duties as Music Teacher

As noted above, Plaintiff worked as a music teacher at Beltsville Adventist School for more than 25 years. Until the late 1990's, she also worked as the School's librarian. *See* Affidavit of Curl, attached hereto as "Exhibit 6."

The students Plaintiff taught at Beltsville Adventist School did not have to be Seventh-day Adventists, and she estimates that 10% to 20% of the students were not. *Id.*

---

[5] In the email, Ms. Prestol-Dominguez cited to section 9600 of the Columbia Union Conference Education Code, which, consistent with local, state, and federal disability discrimination laws, "provides that if a teacher becomes unable to perform the essential job functions with or without reasonable accommodations, they cannot continue in the position." Aug. 14, 2013 Email from Prestol-Dominguez.

[6] With respect to Plaintiff finding herself unemployed, it should be noted that, based upon assertions made by Defendants themselves, but for Defendants' failure and refusal to allow reasonable accommodations for Plaintiff's disability in early August of 2013, Plaintiff apparently would have been permitted to continue working for them. Specifically, in her August 11, 2013 email to Plaintiff, Ms. Prestol-Dominguez indicated that Plaintiff could "return to work" with a release from her doctor, and that she "looked forward to receiving" said release. Aug. 11, 2013 Email Exchange. And in her email to Plaintiff three days later, on August 14, 2013, Ms. Prestol-Dominguez referred to Plaintiff applying for disability benefits "until you are fully cleared to return to work." Aug. 14, 2013 Email from Prestol-Dominguez. Defendants' argument in their Motion is consistent with these emails from Ms. Prestol-Dominguez. Specifically, on page 5 of the Memorandum accompanying their Motion, Defendants state, in pertinent part, as follows: "The Potomac Conference then notified Plaintiff that they would not be able to accommodate her based upon the doctor's note she provided as these conditions are unreasonable. …. Accordingly, Potomac Conference did not continue Plaintiff's employment at Beltsville [Adventist School] after the 2012-2013 school year." Defs.' Memo. at 5.

Significantly, to perform the position of music teacher at Beltsville Adventist School, there was no requirement to have any ministerial training. *Id.* And Plaintiff's own collegiate education was entirely secular in nature. *Id.* She holds an undergraduate degree in art, with a minor in music. *Id.* She also holds a degree in playing the accordion. *Id.* And her master's degree, which she received from the University of Maryland in approximately 1991, is in elementary education. *Id.* She does not hold any degrees in religion or religious studies. *Id.*

While Plaintiff is personally a Seventh-day Adventist, she is not now, nor has she ever been, a member of the clergy. *Id.* And while she was at Beltsville Adventist School, she never held herself out as a minister. *Id.*

Critically, while working at Beltsville Adventist School, she was never formally and officially commissioned as a minister, even though it was offered to her each year by Defendant Potomac Conference. *Id.* Plaintiff always declined the offer. *Id.*

The title of Plaintiff's job at Beltsville Adventist School was simply music teacher. *Id.* The words minister or ministry were not associated with her title. *Id.*

One of Plaintiff's main objectives as music teacher at Beltsville Adventist School was to teach the students skills associated with singing, playing instruments, and reading music. *Id.* She also focused on the history of music in the United States and abroad. *Id.* She would additionally take the students on field trips to the Kennedy Center or the Meyerhoff each year to attend secular plays, symphonies, and operas. *Id.*

Contrary to what Defendants contend, while Plaintiff did teach songs that were sacred, such songs did not make up a substantial portion of the songs she taught in total. *Id.* She also taught many songs that were classical and/or American. *Id.*

During the school year, approximately every month or two, Plaintiff's students would perform at the church on site at the School. *Id.* The songs performed were both secular and sacred. *Id.*

Although a brief prayer service was conducted each morning before school started for the faculty members themselves, the School's various teachers, including Plaintiff, were <u>obligated</u> to conduct the service on a rotating basis. *Id.* There was <u>no</u> discretion in doing this. *Id.* It was required by the School. *Id.*

Finally, and very significantly, Plaintiff never, at any time, taught religion or bible study to the students at Beltsville Adventist School. *Id.*

### III. LEGAL ARGUMENT

A couple of legal principles need to be stressed at the outset. The first is that, based upon case law both pre-dating and post-dating the *Hosanna-Tabor* decision, religious institutions clearly <u>can</u> be held liable for employment-related actions, even when they involve plaintiffs who are deemed ministers by the court. *See, e.g., Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597 (Ky. 2014); *Galetti v. Reeve*, 331 P.3d 997 (N.M. Ct. App. 2014); *Second Episcopal Dist. African Methodist Episcopal Church v. Prioleau*, 49 A.3d 812 (D.C. 2012); *Prince of Peace Lutheran Church v. Linklater*, 421 Md. 664 (2011); *McKelvey v. Pierce*, 800 A.2d 840 (N.J. 2002); *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999).

Second, Plaintiff herein has asserted claims under both state/local law as well as federal law. *See generally* Pl.'s Complaint. The law applicable to these claims and the interpretation thereof by the courts are different, and, as such, these claims must be given individual attention and analysis by this Honorable Court. *See generally Haas v. Lockheed Martin Corp.*, 396 Md. 469, 482 n.10 (2007).

## A. Plaintiff Curl was Not a Minister

Needless to say, if Defendants cannot remove all genuine doubt in the Court's mind that Plaintiff was a minister, *see supra* Part I.C., then their Motion must be <u>denied</u>. So, the first step in opposing Defendants' Motion (but not the last one -- *see infra* Part III.B.) is obviously to demonstrate to this Honorable Court how and why Plaintiff was not a minister.

While agreeing that the "ministerial exception is not limited to the head of a religious congregation," the Supreme Court in *Hosanna-Tabor* did not "adopt a rigid formula for deciding when an employee qualifies as a minster." *Hosanna-Tabor*, 132 S. Ct. at 707. Nonetheless, it is apparent that a religious employer's recitation of allegedly religion-based duties in contractual agreements or church policies is not dispositive on the issue. *See Archdiocese of Washington v. Moerson*, 399 Md. 637, 653-56 (2007) (finding plaintiff was not a minister despite language in his contract which would suggest that he was). The reviewing court must instead examine how the plaintiff actually presented himself or herself and what duties he or she actually performed. *See, e.g., Hosanna-Tabor*, 132 S. Ct. at 707-08.

In this case, as detailed in her Affidavit, Plaintiff was not required to have ministerial training to do her job as music teacher,[7] and, in fact, all of her collegiate educational background was secular in nature. Her degrees were in art, music, and elementary education. She held no degrees in religion or religious studies.

Plaintiff was never a member of the clergy, and she never held herself out as a minster while teaching at Beltsville Adventist School. She was also never formally and officially commissioned as a minster.

One of her main objectives in instructing her students was to teach them the skills associated with performing music, i.e., how to sing, how to play musical instruments, and how to read music. She also focused on teaching about the history of music. This was entirely secular work.

There were sacred songs that she taught her students and some of those songs were performed for the church on site at the School, but such songs did not constitute a substantial portion of the songs she taught in total, contrary to what Defendants contend in their Motion. She also taught many songs that were classical and/or American.

And while Plaintiff did sometimes conduct a brief, before-school prayer service for the faculty on a rotating basis with the other teachers, it was an obligatory (as opposed

---

[7] Interestingly, Defendants' job posting for Plaintiff's would be replacement in August of 2013 did not identify any requirements to be either trained in religion or have experience in teaching religion in order to apply for the job. The only reference to religion in the entire posting was that Defendants were looking for someone "Christian," which is a qualification held by countless millions of Americans. Otherwise, all that the applicant needed was to have a "degree in music education and some experience working with children." *See* Job Posting for Music Teacher, attached hereto as "Exhibit 7." For all intents and purposes, Defendants appeared to be seeking a teacher for an entirely secular purpose. And that's because they were -- this was not a ministerial job.

to discretionary) task and she only had to do it periodically (based upon the rotation of teachers).

Finally, Plaintiff did not, at any time, teach religion or bible study to the students at the School. As such, she certainly never taught a full hour of bible study every day like the plaintiff in *Redhead v. Conference of Seventh-day Adventists*, 440 F. Supp.2d 211 (E.D.N.Y. 2006). And yet, the plaintiff in the *Redhead* case, who was a teacher at a Seventh-day Adventist school, was <u>not</u> deemed a minister by the court. *See id.*

Other cases, in addition to the *Redhead* case, likewise stand for the proposition that teachers like Plaintiff herein are not ministers. *See, e.g., Herx v. Diocese of Fort Wayne-South Bend Inc*., 48 F. Supp.3d 1168 (2014); *Kant v. Lexington Theological Seminary*, 426 S.W.3d 587 (Ky. 2014).[8] *See also Archdiocese of Washington v. Moerson*, 399 Md. 637 (2007).

Long story short, Plaintiff's duties in relation to her job at Beltsville Adventist School did not obligate her to conduct her affairs as a minister. She was basically a teacher who taught music skills and history to her students. As such, the ministerial exception should not be applied in her case by this Honorable Court.

### B. Even if Plaintiff Curl is Deemed a Minister by Court, Her Various Causes of Action Remain Viable Under the Law

In considering the arguments below, Plaintiff would suggest to this Honorable Court that it is important to bear in mind that neither the Maryland appellate courts nor the Fourth Circuit have yet offered their respective interpretations of the U.S. Supreme

---

[8] This decision by the Supreme Court of Kentucky <u>reversed</u> the lower court's decision, which is incorrectly cited by Defendants in their Memorandum. *See* Defs.' Memo. at 15, 18.

Court's ruling in the *Hosanna-Tabor* case. Additionally, Plaintiff would remind this Court of the concept set forth above, *see supra* Part III, that she is pursuing claims under state/local law as well as federal law, and that these claims must therefore be given individual attention and analysis by this Honorable Court. Finally, Plaintiff asks the Court to recognize that the component parts of each of Plaintiff's claims must also be considered independently with respect to the application, if any, of the ministerial exception. *See McKelvey*, 800 A.2d at 856-57. In other words, if the Court finds that a particular part of a particular cause of action should be dismissed, that should not inherently mean that other parts need to be dismissed as well.

### 1. Discrimination/Retaliation Claims

In Counts IV, V, VI, VII, VIII, X, XI, and XII of her Complaint, Plaintiff pursues her claims for disability discrimination/retaliation under federal, state, and local law, and her claims for age discrimination under federal, state, and local law.

With respect to the federal claims, particularly under the ADA, it is important to recognize that *Hosanna-Tabor* was a case focused upon a retaliatory <u>termination</u>. *See Hosanna-Tabor*, 132 S. Ct. at 710 ("The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to <u>fire</u> her. Today we hold <u>only</u> that the ministerial exception bars such a suit." (emphasis added)). However, Plaintiff's ADA claims in this case are not just limited to the subject of her termination by Defendants. She also seeks compensation for being harassed and for Defendants' failure and refusal to accommodate her disability or to engage in the interactive process. *See, e.g.,* Pl.'s Complaint at ¶¶ 41-42. At a minimum, these aspects

15

of Plaintiff's ADA claims should survive Defendants' Motion, even if the Court deems Plaintiff to be a minister.

Similarly, these aspects of her claims, even <u>including</u> her termination, should clearly survive as asserted in her causes of action for discrimination/retaliation under <u>state and local law</u>. As detailed above, according to Defendants, Plaintiff's termination arose out of Defendant decision (which Plaintiff contends was wrongful) to not accommodate her disability, and not because of any deficiency in her work performance or because of some doctrine-based reason. *See supra* Part II.A.

Under the *Linklater* case, which is the most recent pronouncement of the Maryland Court of Appeals on the ministerial exception, the state/local claims for discrimination/retaliation should be permitted to proceed. In *Linklater*, the Court of Appeals approved of the plaintiff's claim for sexual harassment and hostile work environment as well as her claim for gender discrimination because, even though plaintiff was deemed a minister, "the Church has not argued that there is any doctrinal reason for the harassment alleged by [her]." *Linklater*, 421 Md. at 690. The Court then quoted the unpublished decision of the Court of Special Appeals below, which it was affirming, for the proposition that these claims "can go forward without running afoul of the ministerial exception because there is no contention that sexual harassment is part of the ministry. In other words, the Church is not putting forth any religious justification for [the harasser's] conduct." *Id.* at 691 (citation omitted).

As such, under state law, the facts of Plaintiff's case should allow the state/local claims to proceed, even if the ministerial exception is applied by this Honorable Court.

The stated reason given by Defendants for their mistreatment and termination of Plaintiff had nothing to do with church doctrine. *See supra* Part II.A. It was an entirely secular rationale. And Maryland law, under *Linklater*, allows for a court to review and render a verdict in such a situation.

### 2. Contractual Claims

Well-settled law dictates that Plaintiff's contractual claims, asserted in Counts I and II of her Complaint, clearly should also survive Defendants' Motion. As stated recently by the Superior Court of Pennsylvania:

> "A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1358 (D.C. Cir. 1990) (citing *Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 20 L. Ed. 666 (1871)). In *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), the United States Supreme Court specified that courts may always resolve contracts governing "the manner in which churches own property, hire employees, or purchase goods." *Id.*, 443 U.S. at 606. Even cases that rejected ministers' discrimination claims have noted that churches nonetheless "may be held liable upon their valid contracts." *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 739 (1986). "Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights [in selecting or terminating its ministers]." *Petruska v. Gannon University*, 462 F.3d 294, 310 (3rd Cir. 2006), *cert. denied*, 550 U.S. 903, 127 S. Ct. 2098, 167 L. Ed. 2d 813 (2007).

*Mundie v. Christ United Church of Christ*, 987 A.2d 794, 798 (Pa. Super. Ct. 2009).

Following the U.S. Supreme Court's issuance of its *Hosanna-Tabor* decision, the Supreme Court of Kentucky recently maintained this same stance:

> When deciding whether a claim is barred by the ministerial exception, it is important to remain mindful of the ministerial exception's underlying purpose: to allow religious institutions, free from government interference,

to exercise freely their right to select who will present their faith tenets. Although state contract law does involve the governmental enforcement of restrictions on a religious institution's right or ability to select its ministers, those restrictions are not *governmental* restrictions. Simply put, the restrictions do not arise out of government involvement but, rather, from the parties to the contract, namely, the religious institution and its employee.

Contractual transactions, and the resulting obligations, are assumed voluntarily. Underneath everything, churches are organizations. And, like any other organization, a "church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." Surely, a "church can contract with its own pastors just as it can with outside parties." "Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights."

*Kirby*, 426 S.W.3d at 615-16 (footnotes with citations omitted). In finding that the plaintiff, a minister, could pursue his claim for breach of his alleged employment contract, the Kentucky court stated as follows:

[T]his is a situation in which a religious institution has voluntarily circumscribed its own conduct, arguably in the form of a contractual agreement, and now that agreement, if found to exist, may be enforced according to its own terms. That cannot breach church autonomy. Arguably, instead, this exemplifies religious autonomy because religious institutions are free to set forth policies that align with their respective mission.

*Id*. at 616 (footnote omitted).

Consistent with these principles, Defendants in this case should be required to live up to the contractual commitments they made to Plaintiff. Defendants voluntarily chose to encumber themselves with Plaintiff's contract. They could have employed her on an at will basis. But they made a choice to give Plaintiff a contract. No law compelled them to

do so, and no law would become intertwined with church doctrine should Plaintiff be permitted to seek enforcement of the contract.

Plaintiff is aware of the Maryland Court of Appeals' ruling in *Bourne v. Center on Children, Inc.*, 154 Md. 42 (2003), which is cited by Defendants in their Motion. However, the facts of the *Bourne* case render it readily distinguishable from this one. According to the court:

> Even assuming there was a contract, in evaluating the parties' adherence to such a contract, the court would have to make a determination regarding whether appellant met the qualifications to act as a minister for the Church. …. In considering the issues raised by appellant, the court would have to consider whether appellant was properly performing his job. Doing so would mandate the court to consider appellant's adherence to religious tenants, his spiritual successfulness, as determined by the church, his teaching skills, and his relationship with both clergy and worshipers. Such determinations are clearly prohibited by the case law outlined above.

*Id.* at 55-56. In the case presently before this Court, Plaintiff's performance in her job is not at issue. The end of Plaintiff's employment had nothing whatsoever to do with her duties or skills as a music teacher. *See supra* Part II.A. So, that is not a subject matter that the court in this case would have to examine, and, as such, the *Bourne* case creates no precedential hurdle for Plaintiff herein. [9]

---

[9] It should be noted that, in the case of *Prince of Peace Lutheran Church v. Linklater*, 421 Md. 664 (2011), the Maryland Court of Appeals, while allowing plaintiff to proceed with her claim for sexual harassment and hostile work environment as well as her claim for gender discrimination, nonetheless did affirm dismissal of plaintiff's two contract-based claims on the ground that said claims would, according to the court, "necessarily involve an inquiry into matters of church governance and discipline." *Id.* at 697. However, the court's decision includes no recitation or analysis of the facts underlying the contract-based claims. Indeed, in the dissent issued by three of the seven judges on the court, the dissenters state that the majority of the court "briskly sweeps away" the contract-based claims, along with several others. *Id.* at 703 (Adkins, J., dissenting). It remains a mystery as to why the majority did so. Hence, the decision of the majority in relation to these contract-based claims should not and cannot serve as a viable precedent in relation to the ministerial exception's impact on contact claims generally.

Accordingly, Plaintiff's contractual claims should be permitted to proceed, even if she is deemed a minister by this Honorable Court.

### 3. Wrongful Discharge Tort Claim

In Count III of her Complaint, Plaintiff asserts her tort claim for wrongful discharge in violation of public policy under Maryland common law. In a nutshell, by statute, employers in Maryland cannot terminate their employees for filing workers' compensation claims. *See* Pl.'s Complaint at 9-10. That aforementioned statute reads as follows: "An employer may not discharge a covered employee from employment solely because the covered employee files a claim for compensation." Md. Code Ann., Labor & Employment § 9-1105(a). The statute further allows for the collection of a fine or the imposition of a term in prison if it is violated. *See id*. at § 9-1105(b).

Defendants in this case are considered employers under the workers' compensation law in Maryland (which includes the above-referenced statutory provision). Defendants do not argue or even suggest otherwise in their Motion.[10]

All that the Maryland appellate courts ever did above and beyond what § 9-1105 already statutorily required was to make the concept actionable as a private right of action. *See Ford v. Rigidply Rafters, Inc.*, 999 F. Supp. 647 (D. Md. 1998). Such an action is pursued in the form of a wrongful termination claim, as Plaintiff has done. It is a tort. And Defendants can be held liable for it.

---

[10] And it should be noted that there is no carve-out provision for religious employers in the workers' compensation law like there is in the unemployment law. *See* Md. Code Ann., Labor & Employment §§ 8-208, 8-909.

It is important to note that this sort of claim is in no way adversely impacted by the Supreme Court's ruling in the *Hosanna-Tabor* case. In its decision, the Court expressly declined to address whether a wrongful discharge tort claim is barred by the ministerial exception. As stated by the Court:

> According to the EEOC and Perich, [the ministerial] exception could protect religious organizations from liability for retaliating against employees for reporting criminal misconduct or for testifying before a grand jury or in a criminal trial. ….
>
> ….
>
> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

*Hosanna-Tabor* 132 S. Ct. at 710. The significance of this language to the instant case cannot be overstated.

In Maryland, an employer can be held liable under the common law tort of wrongful discharge for "retaliating against employees for reporting criminal misconduct or for testifying." *Id*. Specifically, "'the Legislature [in Maryland] ha[s] created a cognizable statutory interest in the ability to <u>report crimes</u> or <u>testify</u> at an official proceeding without fear of retaliation' sufficient to sustain a wrongful discharge claim . . . ." *Parks v. Alpharma, Inc.*, 421 Md. 59, 80 (2011) (citation omitted) (emphasis added). Critically, as noted above, the wrongful discharge tort in Maryland <u>also</u> covers

an employee being terminated for filing a workers' compensation claim, as Plaintiff herein has alleged.

In reacting to the concern expressed by the EEOC and Perich in the *Hosanna-Tabor* case about these sorts of claims being wiped away by the Court's decision, the Court declared, in the above-quoted excerpt of its decision, that it was expressing <u>no view</u> as to whether the ministerial exception bars "other types of suits" beyond discriminatory termination claims, <u>i.e., claims for torts like wrongful discharge</u>.

Plaintiff's wrongful discharge claim has nothing to do with church doctrine, it is clearly not precluded by the *Hosanna-Tabor* case or other binding case law, and it should not be dismissed by this Honorable Court, even if the Court finds that Plaintiff was a minister.

### 4. FMLA Claim

The final claim left to be addressed is Plaintiff's claim under the FMLA, which is asserted by her in Count IX of her Complaint. It need only be addressed briefly because Defendants did not address it in their Motion at all. In this case, Defendants expressly authorized Plaintiff to take leave under the FMLA. *See supra* Part II.A. Plaintiff alleges in her Complaint that Defendants, in retaliation for her having taken said leave, "mistreated and ultimately terminated" her. Pl.'s Complaint at ¶ 74.

Although there is a complete dearth of case law on the subject of the ministerial exception's interaction, if any, with a plaintiff's rights under the FMLA, Plaintiff herein maintains that, at a minimum, the same analysis set forth above, *see supra* Part III.B.1., would apply here with equal weight. Specifically, if this Court were to hold that

*Hosanna-Tabor* is applicable to Plaintiff's FMLA claim, then at least her pre-termination mistreatment by Defendants should be actionable.

## IV. CONCLUSION

For these reasons, as well as any additional reasons asserted by Plaintiff in any hearing on this matter,[11] Plaintiff hereby respectfully requests that this Honorable Court enter an Order denying Defendants' Motion in its entirety.

Respectfully submitted,

_____/s/  Neil R. Lebowitz_____
Neil R. Lebowitz, Bar No.: 25155
Lebowitz Law Firm
10440 Little Patuxent Pkwy., Suite 590
Columbia, Maryland 21044
neil@lebowitzlegal.com
410-730-9010
Counsel for Plaintiff

---

[11] Defendants have requested a hearing in their Motion, rendering superfluous the need for Plaintiff to additionally do so.