FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Southern Division

2016 AUG 15  P 4: 16

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

|  |  |
|---|---|
| **DORIS R.S. CURL,** | * |
| **Plaintiff,** | * |
|  | * |
| **v.** | * |
|  | * |
| **BELTSVILLE ADVENTIST SCHOOL.,** | * |
| ***et al.,*** | * |
|  | * |
| **Defendants.** | * |

Case No.: GJH-15-3133

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

Plaintiff Doris R.S. Curl initiated the present action in the Circuit Court for Prince George's County, Maryland, alleging various federal employment discrimination and state law claims against her former employers, the Beltsville Adventist School and the Potomac Conference Corporation of Seventh-day Adventists (collectively, "Defendants"). ECF No. 2. Defendants filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment in state court before removing the action to this Court. ECF Nos. 1 & 6. Defendants' Motion is now pending before this Court, along with Plaintiff's Motion to Remand the action to state court. ECF No. 11. No hearing is necessary to resolve these motions. *See* Loc. R. 105.6 (D. Md.). Although Plaintiff's Motion to Remand will be denied, the Court grants Defendants' Motion in part, dismissing Plaintiff's claims arising under federal law, and Plaintiff's remaining claims will be remanded to state court pursuant to 28 U.S.C. § 1367.

## I.    BACKGROUND[1]

The Potomac Conference Corporation of Seventh-day Adventists ("Potomac Conference") is a religious organization that operates Seventh-day Adventist churches and schools in the District of Columbia, Virginia, and Maryland. ECF No. 2 ¶ 3; ECF No. 6-2 ¶ 2A. One of the schools that the Potomac Conference operates is the Beltsville Adventist School (the "School"), a religious school located in Prince George's County, Maryland that educates students in kindergarten through eighth grade. ECF No. 2 ¶¶ 2–3; ECF No. 6-2 ¶ 2B.

This action arises out of Plaintiff's termination from her employment as a music teacher at the School, where, before her termination, she had worked full-time for more than twenty five years. ECF No. 2 ¶¶ 1, 7; ECF No. 14-6 ¶ 2. Defendants argue that any claims arising out of their decision to terminate Plaintiff are barred by the so-called ministerial exception granted by the First Amendment to the United States Constitution because Plaintiff is a "minister" as that term has been used under the exception. *See generally* ECF No. 6-1.

Plaintiff holds an undergraduate degree in art, with a minor in music, as well as a master's degree in elementary education, which she received from the University of Maryland. ECF No. 14-6 ¶ 5. Although Plaintiff's collegiate education was secular in nature, Plaintiff also holds a secondary school diploma, as well as a nurse's aide certificate, from Brazil Adventist College, and a diploma for teaching music and accordion from the Adventist Music Conservatory. ECF No. 17-1 at 2, 4. Plaintiff indicates that she was not required to have any ministerial training for her position as a music teacher at the School. ECF No. 14-6 ¶ 4.

In her role as a music teacher at the School, Plaintiff, who is herself a Seventh-day Adventist, *id.* ¶ 7, was responsible for teaching students skills associated with singing, playing instruments, and reading music, as well teaching the history of music in the United States and

---

[1] For the purposes of deciding Defendants' Motion, all facts are viewed in the light most favorable to Plaintiff.

abroad, *id.* ¶ 12. Plaintiff taught students both secular and sacred music, *id.* ¶ 14, but, according to Wendy Pega, the Principal of the School, Plaintiff has indicated that one of her goals as a teacher was to allow her students to "see Jesus through music," ECF No. 6-5 ¶ 2E. Every month or two, Plaintiff's students performed at the church that is on site at the School, including both secular and sacred music. ECF No. 14-6 ¶ 15. Each school day began with a prayer service for the faculty members, which various teachers, including Plaintiff, were required to take turns conducting, but Plaintiff never taught religion or bible study classes to the students. *Id.* ¶¶ 16–17. Students at the School were not required to be Seventh-day Adventists, and Plaintiff estimated that 10 to 20 percent of her students were not. *Id.* ¶ 3.

Plaintiff held a "Commissioned Ministry of Teaching License" which she was awarded after completing at least three years of teaching in the Seventh-day Adventist school system. ECF No. 17-1 ¶ 2G. After six or more years of service, Plaintiff was eligible to receive a "Commissioned Ministry of Teaching Credential," but she turned it down. *Id.* In a 2010 performance evaluation of Plaintiff's work, in which she was evaluated for her "spiritual leadership," Pega indicated that Plaintiff "[a]t all times . . . demonstrates a lifestyle consistent with accepted Seventh-day Adventist church standards"; that she "encourages her students to see their performances as opportunities to share God through music"; and that "[h]er selection of music is done with the hope that the students will grow in their relationship with Christ as they sing the words and take in the message." ECF No. 17-2 at 5.[2]

The Columbia Union Educational Code (the "Education Code"), which was incorporated by reference into Plaintiff's employment contract, ECF No. 6-2 ¶ 2C; ECF No. 6-4, sets forth guidelines and standards for the establishment and operation of Seventh-day Adventist schools,

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

3

including employment standards and philosophies for teachers in such schools. *See* ECF No. 6-3;
ECF No. 6-6 at 1. It was created and published by another Seventh-day Adventist Church
organization, the Columbia Union Conference of Seventh-day Adventists. ECF No. 6-2 ¶ 2C.
Under the Education Code, the "primary aim of Seventh-day Adventist education is to provide
opportunity for students to accept Christ as their Savior, to allow the Holy Spirit to transform
their lives, and to fulfill the commission of preaching the gospel to all the world." ECF No. 6-3
at 2. The Education Code further provides that "Adventist schools are an integral part of the
Church." *Id.* at 3. Adventist schools are encouraged to "conduct a Week of Spiritual
Emphasis/Week of Prayer annually, [p]referablly in the fall and spring" and principals, deans,
and teachers are required to provide a "devotional period" for students each school day. *Id.* at 4.
With respect to employment principles, the Education Code "requires that schools employ only
those who live in complete harmony with the beliefs and practices of the Church. Therefore, an
occupational qualification for any position is that applicants will be baptized Adventists
committed to the Church's program of ministry." *Id.* at 6. Instructional personnel of schools are
expected to "[p]ractice enthusiastically and consistently the ideals of the Church";
"[d]emonstrate a high sense of loyalty to Adventist educational philosophy"; and "[l]ook upon
Christian educational service as a holy vocation." *Id.* at 8. Moreover, School personnel such as
Plaintiff were required to "maintain membership in their constituent or academy churches and
participate in church activities, programs, and finances, including the practice of tithing through
the local employing organization." *Id.* at 7. Notably, a portion of Plaintiff's salary was paid by
tithe funds,[3] ECF No. 6-2 ¶ 2F, though Plaintiff was unaware of that fact during her employment
at the School, ECF No. 14-6 ¶ 18.

---

[3] Within the Seventh-day Adventist faith, tithe funds are to be used for ministry. ECF No. 6-2 ¶ 2F.

4

On February 6, 2013, while working at the School, Plaintiff fell and sustained a serious physical and neurological injury, which limited the operation of Plaintiff's brain, neurological system, and musculoskeletal system. ECF No. 2 ¶ 8; ECF No. 6-2 ¶ 2H. The injury made it difficult for Plaintiff to see, concentrate, and think, as well as care for herself or perform manual tasks. ECF No. 2 ¶ 8. Plaintiff filed a claim for workers' compensation benefits in March 2013. *Id.* ¶ 9; ECF No. 6-7. Plaintiff's injury caused her to be absent from work for significant periods of time, but Plaintiff received notes from her treating physicians explaining the need for her absences. ECF No. 2 ¶ 10.

In March or April 2013, while Plaintiff was still out on leave pursuant to her doctors' orders, *id.* ¶ 11, Keith L. Hallam, the Vice President for Education of the Potomac Conference, sent a letter to Plaintiff "invit[ing] [her] to share [her] ministry" with School students for the 2013–2014 school year, ECF No. 6-6 at 1. That letter indicated that Plaintiff's appointment to continue at the School for that year required that she meet certain conditions, including active membership in a Potomac Conference constituent Seventh-day Adventist Church "with evidence of loyalty to denominational standards and teachings," as well as "fulfillment of the qualifications and responsibilities required of instructional personnel as outlined in the . . . Educational Code." *Id.* Plaintiff signed the annual contract, incorporating the Education Code, to continue her employment at the School for the 2013–2014 school year on April 22, 2013, and it was signed by Hallam on May 13, 2013. ECF No. 6-4.

On June 28, 2013, a Potomac Conference human resources representative, Johana Prestol-Dominguez, sent a letter to Plaintiff explaining that Plaintiff's "report to work date" would be August 12, 2013. ECF No. 14-2 at 1. The letter further stated:

> We hope that your physician will clear you for return to work and [we] know that is your wish as well. However, if you are unable to return to work on that date we

have chosen to provide you with a full month's wages through August 30, 2013
above and beyond policy. At that time it will not be possible for us to hold your
position open for you any longer and other staffing arrangements will need to be
made.

*Id.* Having not received any clearance for Plaintiff to return to work one month later, in a letter

dated July 30, 2013, Hallam explained that it was "with sadness that [the School] [would] be

withdrawing [Plaintiff's] contract [for the 2013–2014 school year] due to [her] inability to meet

its requirements." ECF No. 6-8 at 1. Although the letter was sent by certified mail, Plaintiff did

not receive it. *See id.* at 2; ECF No. 2 ¶ 15; ECF No. 14-4 at 1.

On August 8, 2013, Plaintiff's neurologist wrote a letter indicating that he was

"reluctantly allowing her to attempt to return to work" but that Plaintiff would require certain

accommodations, namely, that after two or three hours of work, Plaintiff would need to be

allowed to take a fifteen or twenty minute rest break "in an environment that is quiet and not

brightly lit and that allows her to recline." ECF No. 6-9 at 1. The letter further indicated that "[i]f

symptoms . . . become exacerbated . . . and do not subside with rest," then Plaintiff would need

to "be allowed to be relieved of her duties for that day." *Id.* Plaintiff then sent an email to Pega

and Hallam the following day explaining that her doctor was allowing her to return to work

"with minor accommodations which [would] not affect [her] performance as a teacher," and

indicated that she would report to the School on August 12, 2013. ECF No. 14-3.

On August 11, 2013, Prestol-Dominguez responded to Plaintiff's email, indicating that it

had been forward to her by Pega, and stated that Plaintiff was "informed via registered letter last

week that the Potomac Conference had decided to rescind [her] 2013–2014 contract." ECF No.

14-4 at 1. That email also indicated that the School had not yet received the release from

Plaintiff's doctor and that a copy would need to be sent for the Potomac Conference to make a

decision regarding Plaintiff's return to work and the requested accommodations. *Id.* Prestol-

6

Dominguez then instructed Plaintiff not to report to work until she was authorized to do so. *Id.*

Plaintiff nevertheless reported to work on August 12, and, after she was given a copy of the letter

which rescinded her contract, she was promptly sent home. ECF No. 2 ¶ 15 n.4; ECF No. 15-5 at

1.

No further discussion between Plaintiff and Defendants took place until, on August 14,

2013, Prestol-Dominguez emailed Plaintiff indicating that they had received notice from

Plaintiff's doctor regarding the requested accommodations and further stating:

> We regret to inform you that the Potomac Conference will not be able to
> accommodate the restrictions placed upon your return to work. Accommodation
> of the restrictions would not permit you to perform the basic core functions of the
> position as set forth in your employment agreement. As you know, the . . .
> Education Code provides that if a teacher becomes unable to perform the essential
> job functions with or without reasonable accommodations, they cannot continue
> in the position.

ECF No. 14-5 at 1. Plaintiff alleges, however, that based on her teaching schedule, she would

have had sufficient time during the day between classes to take the necessary rest breaks to

accommodate her medical needs. ECF No. 2 ¶ 17.

After her termination, the School posted on a website called the "Adventist Education

Educator Toolbox" a job posting seeking a "Christian, caring, and engaging" music teacher. ECF

No. 14-7 at 2. The posting noted that applicants must have a degree in music education and some

experience working with children, but did not specify that applicants were required to be

members of the Seventh-day Adventist Church. *Id.* Plaintiff was eventually replaced by a teacher

who is approximately 26 years younger than Plaintiff; Plaintiff was 56 years old at the time of

her termination. ECF No. 2 ¶ 18.

Plaintiff initiated this action on May 15, 2015 in the Circuit Court for Prince George's

County, Maryland, alleging twelve causes of action related to her termination: two claims

7

asserting breach of contract (Counts I & II); wrongful termination in retaliation for filing a workers' compensation claim in violation of Md. Code Ann., Labor & Emp. § 9-1105(a) (Count III); violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.* (Counts IV & V); violations of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.* (Counts VI, VII & XI); violations of the Prince George's County, Maryland County Code § 2-185 *et seq.* (Count VIII & XII); violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count IX); and violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count X).

On October 14, 2015, while the case was still pending in state court, Defendants filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment in which they argued that all of Plaintiff's claims are barred by the ministerial exception. ECF No. 6. Defendants also requested a hearing on their Motion. *Id.* at 2. One day later, before the state court took any action on Defendants' Motion, Defendants removed the case to this Court. ECF No. 1. Plaintiff timely filed a Motion to Remand the case to state court on October 30, 2015. ECF No. 11. Defendants' Motion and Plaintiff's Motion to Remand are both now fully briefed and ready for resolution. *See* ECF Nos. 14, 16, 17, 18.

## II.   PLAINTIFF'S MOTION TO REMAND

If an action filed in state court is one in which a district court has original jurisdiction, that action may be removed by the defendant to the district court "for the district and division embracing the place where such action is pending," 28 U.S.C. § 1441(a), within thirty days after the defendant is served with the complaint, 28 U.S.C. § 1446(b)(1). In her Motion to Remand, Plaintiff does not argue that this Court lacks jurisdiction over the matter, nor that Defendants' removal was untimely. Rather, she argues that Defendants waived the right to remove the case to

8

this Court by filing a dispositive motion in state court before filing their Notice of Removal. *See* ECF No. 11. The Court disagrees.

"Although there is no statutory basis for remand due to a party's waiver of its right of removal, 'the [United States Court of Appeals for the] Fourth Circuit . . . [has] recognized that a district court could find a waiver under common law, but only in very limited circumstances.'" *Va. Beach Resort & Conference Ctr. Hotel Ass'n Condo. v. Certain Interested Underwriters at Lloyd's, London*, 812 F. Supp. 2d 762, 764 (E.D. Va. 2011) (quoting *Westwood v. Fronk*, 177 F.Supp.2d 536, 540 (N.D.W.Va.2001)). The Fourth Circuit explained that a defendant waives its right to remove an action to federal court by "demonstrating a 'clear and unequivocal' intent to remain in state court," but that "such a waiver should only be found in 'extreme situations.'" *Grubb v. Donegal Mut. Ins. Co.*, 935 F.2d 57, 59 (4th Cir. 1991) (quoting *Rothner v. City of Chicago*, 879 F.2d 1402, 1416 (7th Cir. 1989)); *see also Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 264 (4th Cir. 1998), *abrogated on other grounds by Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567 (2004) (emphasis omitted) ("A defendant may waive the right to remove by taking some such substantial defensive action in the state court before petitioning for removal."); *Johnson v. Celotex Corp.*, 701 F. Supp. 553, 555 (D. Md. 1988), *superseded by statute on other grounds as stated in Zumas v. Owens-Corning Fiberglass Corp.*, 907 F. Supp. 131, 132 (D. Md. 1995)) ("For waiver to have occurred, a defendant must have taken some affirmative action in state court after its right to remove exists."). "The values of judicial economy, fairness, convenience and comity should guide courts in determining whether a finding of waiver is appropriate." *Trademark Remodeling, Inc. v. Rhines*, 853 F. Supp. 2d 532, 542 (D. Md. 2012) (citing *Grubb*, 935 F.2d at 59).

The most obvious example of when a finding of waiver is appropriate is where a defendant removes a case to federal court after receiving an unfavorable determination on the merits of the case in state court. *See Estate of Krasnow v. Texaco, Inc.*, 773 F. Supp. 806, 809 (E.D. Va. 1991) ("[A] defendant must not be allowed to test the waters in state court and, finding the temperature not to its liking, beat a swift retreat to federal court."); *see also Wolfe v. Wal-Mart Corp.*, 133 F. Supp. 2d 889, 893 (N.D.W. Va. 2001) ("[W]here a defendant has notice of the right to remove but continues to litigate in state court, prior to filing a notice of removal, the defendant will be considered to have waived its right to remove."). But in cases where a defendant files a notice of removal simultaneously with or shortly after taking defensive action in the state court proceeding, courts have found that such conduct does not signify the sort of unequivocal intent to remain in state court necessary to constitute a waiver of the right to remove. *See McWilliams v. Broderick*, No. 1:11CV519 JCC, 2011 WL 2669969, at *2 (E.D. Va. July 7, 2011) (finding no waiver where defendant removed case to federal court ninety minutes after filing responsive pleadings in state court); *Jones v. Johnson*, No. 3:11CV001-JAG, 2011 WL 494479, at *2 (E.D. Va. Feb. 7, 2011) (finding no waiver where notice of removal and demurrer/motion to dismiss were filed "simultaneously").

Although "the line between what will constitute waiver of the right to remove and what will not is far from clear," Charles A. Wright & Arthur R. Miller, 14B Fed. Prac. & Proc. Juris. § 3721 (4th ed.), the Court concludes that Defendants' filings in this case did not demonstrate a "clear and unequivocal intent to remain in state court," *Grubb*, 935 F.2d at 59, nor does this case present the sort of "extreme situation," *id.*, in which the Fourth Circuit has indicated that a waiver may be found.[4] Only one day passed between Defendants' filing of its Motion in state

---

[4] In support of her Motion to Remand, Plaintiff points to three out-of-circuit cases which she argues support her position that filing a motion to dismiss in state court prior to removal automatically results in a waiver of the right to

court and its filing of the Notice of Removal that removed the case to this Court. During that

time, Plaintiff did not respond to Defendants' Motion, and the state court took no action upon it.

*See Abraham v. Cracker Barrel Old Country Store, Inc.*, No. 3:11CV182-HEH, 2011 WL

1790168, at *6 (E.D. Va. May 9, 2011) (describing as "critical" to the court's finding of no

waiver the fact that the defendant filed its notice of removal before plaintiff responded to

defendant's defensive motion in state court). Given how quickly Defendants sought to remove

the case to this Court after filing their Motion to Dismiss, this case does not present the sort of

comity concerns presented when a defendant takes "'some further action . . . [in the state court]

that results in a decision [by that court] on the merits of the case.'" *Trademark Remodeling*, 853

F. Supp. 2d at 542 (quoting *Sayre Enterprises, Inc. v. Allstate Ins. Co.*, 448 F. Supp. 2d 733, 736

(W.D. Va. 2006)). In light of these considerations, and the fact that the Fourth Circuit has

warned that waiver should only be found in "extreme situations" where the removing party

clearly indicates a willingness to litigate the merits of the dispute in state court, the Court finds

that Defendants' filing of a motion to dismiss in state court did not waive their right to remove

the case to federal court.

---

remand. *See* ECF No. 11 ¶¶ 7–9 (citing *Kam Hon, Inc. v. Cigna Fire Underwriters Ins. Co.*, 933 F. Supp. 1060
(M.D. Fla. 1996); *Scholz v. RDV Sports, Inc.*, 821 F. Supp. 1469 (M.D. Fla. 1993); *Sandoval v. Target Corp.*, 2012
U.S. Dist. LEXIS 74351 (N.D. Ill. May 24, 2012)). Two of those cases, however, *Kam Hon* and *Scholz*, appear to no
longer be good law. *See Beach TV Properties, Inc. v. Bellsouth Mobility, LLC*, No. 3:06 CV 241 RV/MD, 2006 WL
2131311, at *1 (N.D. Fla. July 27, 2006) (citing *Cogdell v. Wyeth*, 366 F.3d 1245 (11th Cir. 2004); *Yusefzadeh v.
Nelson, Mullins, Riley & Scarborough*, 365 F.3d 1244 (11th Cir. 2004)) (noting that the United States Court of
Appeals for the Eleventh Circuit has "repeatedly held that the filing of a motion to dismiss in state court, without
more, is insufficient to waive a defendant's right of removal" and that cases decided before *Cogdell* and *Yusefzadeh*
"are contrary to the now well-established law of this circuit"). The third case, *Sandoval*, is factually distinguishable
from the present case. In *Sandoval*, the defendant received notice that diversity jurisdiction existed when the
plaintiff amended her complaint to allege an amount in controversy exceeding the jurisdictional amount of $75,000,
and twenty-five days later, after filing a motion to dismiss and seeking transfer of the case to a different state court
division, the defendant finally removed the action to federal court. 2012 U.S. Dist. LEXIS 74351at *5. The court
found that this conduct amounted to a waiver of the right to remove. *Id.* Here, however, the Court does not find that
the one-day delay in removal after filing a dispositive motion amounted to such an unequivocal intent to proceed in
state court.

## III. DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. This Rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). "In general, extrinsic evidence should not be considered at the motion to dismiss phase when the motion challenges the legal sufficiency of a complaint under Rule 12(b)(6)," *Todd v. Xoom Energy Maryland, LLC*, No. GJH-15-154, 2016 WL 727108, at *5 (D. Md. Feb. 22, 2016), because when deciding such a motion, a court "must accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted).

A district court may, however, consider matters outside the pleadings if it converts a motion to dismiss made pursuant to Rule 12(b)(6) into one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Where, as here, the movant expressly captions its motion, 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that the conversion under Rule 12(d) may occur; the court does not have an obligation to notify parties of the obvious." *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (citations and internal quotation

marks omitted); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). However, summary judgment should not be granted if the nonmoving party has not had the opportunity to discover information that is essential to her opposition to the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1987). If the nonmoving party feels that the motion is premature, that party can invoke Rule 56(d) of the Federal Rules of Civil Procedure, which permits a nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ." Fed. R. Civ. P. 56(d). But "the party opposing summary judgment cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citation and internal quotation marks omitted).

Here, Plaintiff generally argues that discovery is needed to resolve the present motion, *see* ECF No. 14 at 2–4, but she has not filed an affidavit or declaration in support of such claim, as is required by Rule 56(d). And, although Plaintiff indicates that cross-examination of relevant witnesses is necessary in order to "provide a fuller picture" of the issues presented in this case, *id.* at 3, it is important to note that "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery. Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be essential to [the] opposition." *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (citations and internal quotation marks omitted). Although cross-examination is undoubtedly an important tool to probe the truth of factual allegations, *see Greene v. McElroy*, 360 U.S. 474, 497 (1959), Plaintiff has failed to provide any "specified reasons" why additional discovery is

necessary to properly oppose Defendants' Motion, *see* Fed. R. Civ. P. 56(d). Accordingly, the Court will treat Defendants' Motion as one for summary judgment.

"Under Rule 56(c) [of the Federal Rules of Civil Procedure], summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 322; *Francis v. Booz. Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir.2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)

14

(quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

### B. Discussion

Defendants' sole argument in support of their Motion is that all of Plaintiff's claims are barred by the so-called ministerial exception grounded in the First Amendment. *See* ECF No. 6-1. The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. As a result, "Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [certain] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 705 (2012). And in *Hosanna-Tabor*, the United States Supreme Court for the first time affirmed, after extensively examining the historical background of the First Amendment, that the ministerial exception is an affirmative defense[5] that "prevents government entanglement in religion by precluding employment discrimination suits" where such a suit would require courts to become involved in the relationship between a religious institution and its ministers. *Davis*, 985 F. Supp. 2d at 710. As the Supreme Court explained:

> The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the

---

[5] Before *Hosana-Tabor*, courts disagreed over whether the ministerial exception posed a jurisdictional bar to a court's ability to hear a case, or whether it was a defense on the merits. The Supreme Court clarified that the exception is an affirmative defense to an otherwise cognizable claim because the issue presented by the exception is "'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" *Hosana-Tabor*, 132 S. Ct. at 709 n.4 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010)).

> church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Hosanna-Tabor*, 132 S. Ct. at 706; *see also McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972) ("The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.").

For the ministerial exception to bar a claim, two factors must be present: the employer must be a religious institution, and the employee must have been a ministerial employee. *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007), *abrogated on other grounds by Hosanna-Tabor*, 132 S. Ct. 694; *see also Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309–10 (4th Cir. 2004). A religious institution, for purposes of the ministerial exception, is one whose "mission is marked by clear or obvious religious characteristics." *Shaliehsabou*, 363 F.3d at 310. Plaintiff does not dispute that both the Potomac Conference and the School share a religious mission, *see* ECF No. 14; ECF No. 6-2 ¶¶ 2A–2D, but she argues that she is not a minister within the scope of the exception, ECF No. 14 at 12–14.

In *Hosanna-Tabor*, the Supreme Court expressly declined to "adopt a rigid formula for deciding when an employee qualifies as a minister," but noted that every Court of Appeals to have considered the issue had concluded that the ministerial exception was not limited to the head of a religious congregation. *Hosanna-Tabor*, 132 S. Ct. at 707. The Supreme Court determined only that it was sufficient for its purposes to conclude that the exception covered the plaintiff in that case, Cheryl Perich, given the circumstances of her employment. *Id.* Perich, who was terminated from employment after she was diagnosed with narcolepsy, was a "called"

16

teacher with the Hosanna-Tabor Evangelical Lutheran Church and School, meaning that she was "regarded as having been called to [her] vocation by God through a congregation." *Id.* at 699–700. Hosanna-Tabor held Perich out as a minister, and Perich considered herself to be a minister "by accepting the formal call to religious service, according to its terms," and also by claiming a special housing allowance on her taxes that is available only to employees earning their compensation "in the exercise of the ministry." *Id.* at 707–08. Perich's title as a minister "reflected a significant degree of religious training followed by a formal process of commissioning." *Id.* at 707. And Perich's job duties included teaching her students religion four days a week, leading them in prayer three times a day, taking her students to school-wide chapel services, and, about twice per year, leading those services. *Id.* at 708. "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church"— the Supreme Court concluded that Perich was a minister covered by the ministerial exception. *Id.* The exception therefore barred her claim of retaliation under the ADA.

In reaching this conclusion, the Supreme Court in *Hosanna-Tabor* rejected the test adopted by the United States Court of Appeals for the Sixth Circuit that, in concluding that Perich was not a minister, gave too much weight to the fact that lay teachers performed the same religious duties as Perich, and placed too much emphasis on the fact that Perich's religious duties consumed only forty five minutes of each workday. *Id.* at 708. The Supreme Court noted that even "[t]he heads of congregations themselves often have a mix of duties, including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities," and that the issue before the Court was "not one that [could] be resolved by a stopwatch." *Id.* at 709. "The amount of time an employee spends on particular

activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations discussed . . . ." *Id.*

Though courts both pre-dating and post-dating *Hosanna-Tabor* have similarly eschewed adopting a rigid formula for determining whether a particular individual is to be deemed a minister, certain factors have been identified as important considerations for making such a determination, including the formal title an individual holds, "the substance reflected in that title," the individual's use of that title, and "the important religious functions performed for the religious institution." *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 613 (Ky. 2014); *see also Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) (considering as relevant factors the employee's function in the religious institution, the employee's relationship to the employer, and the nature of the action as relevant factors for determining whether ministerial exception applies); *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1292 (9th Cir. 2010) (finding that plaintiff, who was not yet ordained but had entered the seminary to become a priest, fell within ministerial exception, but noting that "if a church labels a person a religious official as a mere 'subterfuge' to avoid statutory obligations, the ministerial exception does not apply"); *Davis*, 985 F. Supp. 2d at 710 (citing *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)) (noting that the Fourth Circuit had, before *Hosanna-Tabor*, "similarly eschew[ed] a rigid formula for deciding whether the ministerial exception applies" and rather "has employed an individualized, fact-specific 'primary duties' test."); *Dias v. Archdiocese of Cincinnati*, No. 1:11-CV-00251, 2012 WL 1068165, at *5 (S.D. Ohio Mar. 29, 2012) (considering as relevant factors whether plaintiff was held out as a minister, had any religious title or commission, or was charged with teaching the faith or participating in

18

religious services, and whether defendant periodically reviewed plaintiff's "skills in ministry" or "ministerial responsibilities").

Notably, multiple courts, including the Fourth Circuit, have found that music teachers and directors can be deemed ministers subject to the ministerial exception. *See E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000) (rejecting plaintiff's argument that he was merely "a lay choir director and teacher, charged with the responsibility of training people to sing and perform music" and noting that "music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred"); *see also Starkman v. Evans*, 198 F.3d 173, 176–77 (5th Cir. 1999); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040–41 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor*, 132 S. Ct. 694. And in a case involving seemingly the same Education Code that is applicable to Plaintiff's employment in this case, where a former elementary school teacher at a Seventh-day Adventist school alleged discriminatory discharge and breach of his employment contract, the Fourth Circuit found that the plaintiff fell within the ministerial exception where the Education Code made it clear that "the primary purpose of Seventh-day Adventist elementary education is the redemption of each student's soul through his or her belief and faithful adherence to Seventh-day Adventist theological beliefs" and that "the Seventh-day Adventist Church relies heavily upon its full-time, elementary school teachers to carry out its sectarian purpose." *Clapper v. Chesapeake Conference of Seventh-Day Adventists*, 166 F.3d 1208, 1998 WL 904528, *7 (4th Cir. 1998). The Fourth Circuit further noted that the school "require[d] all of its full-time, elementary school teachers to exemplify the teachings of the Seventh-day Adventist faith in their personal and professional lives," for the obvious purpose of its desire "to insure that the minds of its youth are shaped by model members of the Seventh-day

Adventist faith." *Id.* Given these considerations, together with the fact that teachers lead their students in prayer at various times during the day, formally instructed students in the teachings of the Bible as understood by the Seventh-day Adventist Church, and incorporated the teachings of the Seventh-day Adventist Church throughout the traditional academic curriculum, the Fourth Circuit felt "constrained" to conclude that the ministerial exception applied. *Id.*

By contrast, where an employee's role in a religious organization is wholly or substantially secular, the ministerial exception will not apply. Employment or affiliation with a religious institution is not alone enough to find that an individual is a minister within the bounds of the exception. *See, e.g., Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577, 586 n.5 (D. Md. 2016) (ministerial exception did not apply to school librarian whose position did not include any religious function); *Davis*, 985 F. Supp. 2d at 711 (plaintiff was not a minister of Jewish institution where his primary duties—maintenance, custodial, and janitorial work—were entirely secular, he had no religious training or title, and had no decision-making authority with regard to religious matters, even though he occasionally instructed students about the significance of a religious object after he set it up for certain events, that responsibility was "limited and infrequent" and based on plaintiff's "limited knowledge," considering plaintiff was not Jewish); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind.), *appeal dismissed*, 772 F.3d 1085 (7th Cir. 2014) (language arts teacher at Catholic school was not a minister, where she never led planning for Mass, was not ordained by Catholic Church, did not hold a title with Catholic Church, never had and was not required to have any religious instruction or training to be a teacher at school, never held herself out as a priest or minister, and was considered by principal to be a "lay teacher"); *Dias*, 2012 WL 1068165, at \*5 (computer teacher at Catholic school was not a minister where plaintiff's job duties were wholly secular,

plaintiff had no religious training or title, and was not a Catholic and therefore barred from teaching Catholic doctrine).

Here, it is apparent that Plaintiff's role in the School was ministerial in nature. Although a portion of Plaintiff's responsibilities were secular in nature, Plaintiff acknowledges that she is personally a Seventh-day Adventist whose role at the School included teaching religious music and leading prayer services. ECF No. 14-6 ¶¶ 7, 14, 16. Plaintiff does not dispute that she agreed to abide by the Education Code, which "requires that schools employ only those who live in complete harmony with the beliefs and practices of the Church" and therefore required that all School teachers be "baptized Adventists committed to the Church's program of ministry." ECF No. 6-3 at 6. Additionally, under the Education Code, School personnel were expected to "[p]ractice enthusiastically and consistently the ideals of the Church"; "[d]emonstrate a high sense of loyalty to Adventist educational philosophy"; and "[l]ook upon Christian educational service as a holy vocation." *Id.* at 8. Plaintiff was also required to "maintain membership in . . . constituent or academy churches and participate in church activities, programs, and finances, including the practice of tithing through the local employing organization," *id.* at 7, and a portion of her salary was paid by tithe funds, which are intended to be used for ministry, ECF No. 6-2 ¶ 2F. Moreover, Plaintiff's performance was evaluated in part based on her spiritual leadership. ECF No. 17-2 at 5.

Although Plaintiff indicates that she was unaware that tithe funds paid part of her salary and she maintains that she "never held [herself] out as a minister," ECF No. 14-6 ¶¶ 9, 18, these representations do not suffice to create a genuine dispute with respect to Plaintiff's role in the School. The School clearly held Plaintiff out to be a minister, requiring that she lead prayer services and that she incorporate into her teaching the "Adventist educational philosophy." ECF

No. 6-3 at 8. Indeed, when Plaintiff was extended a contract for the 2013–2014 school year, she was told: "You are being invited to share your ministry with our students for the 2013–2014 school year." ECF No. 6-6 at 1. Plaintiff may not have labeled herself as a minister, but under the circumstances, it is apparent that her students would have perceived Plaintiff to be "a representative of the religious institution authorized to speak on church doctrine." *Kirby*, 426 S.W.3d at 613–14. Moreover, given that "music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred," *Raleigh*, 213 F.3d at 802, and that Plaintiff has represented that she hoped to help her students "see Jesus through music," ECF No. 6-5 ¶ 2E, her role as a music teacher was "important to the spiritual and pastoral mission" of the School, *Raleigh*, 213 F.3d at 802.

The ministerial exception therefore applies to bar Plaintiff's federal employment discrimination claims, namely, those under the ADA, ADEA, and FMLA. *See Hosanna-Tabor*, 132 S. Ct. at 709 (ministerial exception barred claim for retaliatory termination under the ADA); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 170 (5th Cir. 2012) (applying ministerial exception to ADEA claim); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, No. CIV.A. 05-CV-0404, 2005 WL 2455253, at *2 (E.D. Pa. Oct. 5, 2005) (applying ministerial exception to FMLA claim); *see also Hopkins v. DeVeaux*, 781 F. Supp. 2d 1283, 1288–89 (N.D. Ga. 2011) (noting that courts have concluded that the ministerial exception bars actions brought under the ADA, the FMLA, and the Fair Labor Standards Act).

Plaintiff argues, however, that her claims under the ADA should survive insofar as she alleged, in addition to a claim of retaliatory termination, a failure-to-accommodate claim. ECF No. 14 at 15; *see also* ECF No. 2 ¶ 41. In arguing that such claims are not barred by the ministerial exception, Plaintiff notes that, in *Hosanna-Tabor*, the Supreme Court declined to

22

consider whether the ministerial exception would bar other suits such as actions for breach of contract or tortious conduct, and noted that the Supreme Court limited its holding to the case before it, involving an "employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Hosanna-Tabor*, 132 S. Ct. at 710. But multiple courts have applied the ministerial exception in cases involving failure-to-accommodate claims.[6] *See, e.g.*, *Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1104 (9th Cir. 2004) (affirming dismissal of failure-to-accommodate claim due to ministerial exception because "church's failure to accommodate [plaintiff's] disabilities while he was still employed, are a part of the employment relationship between church and minister"); *see also Cronin v. S. Indiana Annual Conference*, No. 1:05 CV 1804 LJM WTL, 2007 WL 2258762, at *6 (S.D. Ind. Aug. 3, 2007).

Because the Court concludes that Plaintiff's claims arising under federal law must be dismissed, and there is not complete diversity of citizenship between the Parties, *see* ECF No. 2 ¶¶ 1–3, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims arising under state law. *See* 28 U.S.C. § 1367(c)(3) (providing that district courts may decline to exercise supplemental jurisdiction over state law claims when the district court has dismissed all claims over which it had original jurisdiction); *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239

---

[6] Plaintiff also suggests that she has alleged a hostile work environment claim related to her disability and that such a claim is not barred by the ministerial exception. ECF No. 14 at 15–16. Although there appears to be a split in authority respecting whether hostile work environment claims are subject to the ministerial exception, *compare Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 953 (9th Cir. 2004) (ministerial exception did not bar hostile work environment claim) *with Skrzypczak v. Roman Catholic Diocese Of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010) (concluding that any Title VII claim, including hostile work environment claims, would improperly interfere with church's right to select and direct its ministers), the Complaint here only vaguely alleges that Defendants' actions "were undertaken to harass and/or interfere with Plaintiff in the exercise or enjoyment of her rights under the ADA," ECF No. 2 ¶ 42, and, notably, does not set forth a separate count alleging a hostile work environment claim. This general allegation, unaccompanied by any factual allegations to support such a claim, is far from what is necessary to state a hostile work environment claim. *See Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 528 (D. Md. 2015) (citations omitted) (setting forth elements of hostile work environment claim and noting that "vague examples of rude and inappropriate behavior" were insufficient to state a hostile work environment claim). Accordingly, even assuming the Complaint contained a hostile work environment claim, dismissal would be necessary for failure to state a claim.

23

F.3d 611, 616 (4th Cir. 2001) (concluding that, if a case has been removed to federal court, district court has the power to remand case to state court, rather than dismiss claims, if it declines to exercise supplemental jurisdiction); *Adams v. Am. Fed'n of State*, No. PWG-14-4023, 2016 WL 795990, at *17 (D. Md. Mar. 1, 2016) (declining to exercise supplemental jurisdiction after dismissing federal claims and remanding common law claims to state court). Thus, Defendants' Motion is granted with respect to Plaintiff's federal law claims, and Plaintiff's remaining claims will be remanded to state court.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Remand, ECF No. 11, is denied, and Defendant's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, is granted, in part, and denied, in part. Plaintiff's federal claims, Counts IV, V, IX, and X are dismissed with prejudice. Plaintiff's remaining claims are remanded to the Circuit Court for Prince George's County, Maryland.

Dated: August  15 , 2016

GEORGE J. HAZEL
United States District Judge

24